**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| The Lyceum, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No._____ |
| | ) | |
| The City of South Euclid, Ohio, | ) | |
| | ) | |
| *Defendant*. | ) | |
| _____) | | |

**VERIFIED COMPLAINT FOR DECLARATORY RELIEF,**
**INJUNCTIVE RELIEF, AND DAMAGES**

COMES NOW the Plaintiff, THE LYCEUM, by counsel and for its causes of action against

Defendant CITY OF SOUTH EUCLID, OHIO, alleges and states the following:

**<u>INTRODUCTION</u>**

1.       This is a pre-enforcement civil rights action to stop the City of South Euclid, Ohio,

from compelling a private Catholic school to communicate government messages that are antithetical

to its religious beliefs, and from forcing this faith-based school to operate in violation of its deeply

held religious beliefs, including its beliefs about marriage and human sexuality.

2.       The Lyceum is a small, Catholic college preparatory school dedicated to providing its

students with a faith-integrated, classical Catholic education.

3.       The school draws members of its faculty from among those who share its religious

beliefs and strive to live them out.

4.       The school draws its students from among those who are willing to submit to the

school's Catholic teaching and conduct standards.

1

5.      But the City of South Euclid, Ohio, recently passed an ordinance that bans "differential treatment" in employment, public accommodations, and housing on the basis of religion, creed, marital status, gender identity or expression, or sexual orientation, among other categories.

6.      The ordinance also forbids employers and public accommodations from making statements indicating that individuals are "objectionable" or "unwelcome" on the basis of religion, creed, marital status, gender identity or expression, or sexual orientation.

7.      Violations of the ordinance are punishable by up to five hundred dollars in fines, restitution, or up to sixty days in jail.

8.      The Lyceum's admissions policies, employment practices, and facility use policies appear to violate the ordinance.

9.      The ordinance is vaguely written, making it impossible for The Lyceum to know with certainty whether its admissions policies, employment practices, and facility use policies violate the ordinance.

10.     The Lyceum has made multiple attempts to obtain clarification from the City regarding whether the ordinance applies to the school and its policies and practices.

11.     The City has twice illegally refused to answer The Lyceum's public records request.

12.     When The Lyceum wrote to the City attorney and asked whether the ordinance applied to The Lyceum, the City refused to say.

13.     Having no other option in the face of significant fines and criminal penalties, The Lyceum now seeks clarification and relief from this Court.

14.     The Lyceum therefore brings this action pursuant to 42 U.S.C. § 1983 for violation of its civil rights.

## JURISDICTION AND VENUE

15.     This action arises under the United States Constitution, particularly the First and Fourteenth Amendments, 42 U.S.C. § 1983, and the Ohio Constitution Article I.

16.     This Court is vested with original jurisdiction over the federal claims by operation of 28 U.S.C. §§ 1331 and 1343.

17.     This Court is vested with supplemental jurisdiction over the pendent state law claims by operation of 28. U.S.C. § 1367.

18.     This Court is vested with authority to grant the requested declaratory judgment by operation of 28 U.S.C. § 2201, *et seq.*

19.     This Court has jurisdiction to award the requested injunctive relief under 28 U.S.C. § 1343.

20.     This Court has jurisdiction to award the requested damages under 28 U.S.C. § 1343.

21.     This Court has jurisdiction to award reasonable costs and attorneys' fees under 42 U.S.C. § 1988.

22.     Venue is proper in United States District Court for the Northern District of Ohio under 28 U.S.C. § 1391(b), because the Defendant resides in the Northern District of Ohio and the events giving rise to the claim occurred within the Northern District of Ohio.

## PARTIES

23.     The Lyceum is a Catholic college preparatory school, established and existing as a non-profit religious corporation under the laws of the State of Ohio.

24.     The Lyceum's principal location is 1545 South Green Road, South Euclid, Ohio 44121.

25.     The Defendant City of South Euclid, Ohio, is a public body corporately and politically established, organized, and authorized under the laws of the State of Ohio, with the authority to sue and be sued, and was at all times relevant herein, operating within the course and scope of its authority and under color of state law.

## STATEMENT OF FACTS

**The Lyceum's Religious Beliefs & Educational Philosophy**

26.     The Lyceum is a Catholic college preparatory school for students in grades six through twelve.

27.     It was founded in 2003.

28.     It is dedicated to providing students with a rigorous Catholic liberal arts education, and forming them to become "lifelong learners in a joyful pursuit of the Truth who is Christ."

29.     As a faith community in communion with the Catholic Church, The Lyceum abides by the teachings of the Catholic Church as set forth by the Magisterium and as articulated in the Holy Scriptures and the *Catechism of the Catholic Church*, including the Church's teachings on marriage and sexuality and the Church's vision of education.

30.     The Lyceum, consistent with teachings of Holy Scripture and the Magisterium of the Catholic Church, believes that biological sex is objective and immutable.

31.     The Lyceum, consistent with teachings of Holy Scripture and the Magisterium of the Catholic Church, believes that marriage is an exclusive, lifelong union between a man and woman that is ordered toward the procreation and education of children.

32.     The Lyceum, consistent with teachings of Holy Scripture and the Magisterium of the Catholic Church, believes that sexual relations are properly reserved to such a marriage.

33.     All members of The Lyceum community—including faculty, staff, parents, guardians, and students—are expected to strive to live a life of virtue guided by the teachings of the Catholic Church in all aspects of their lives.

34.     All Catholic members of The Lyceum community—including faculty, staff, parents, guardians, and students—are expected to affirm and abide by Catholic teachings on marriage and human sexuality.

35.     The Lyceum's community members must accordingly live lives of chastity appropriate to their respective situations (*e.g.*, as single, married, or consecrated religious people).

36.     The Lyceum joyfully exercises its responsibility to teach Catholic faith and morals as expressed in the *Catechism of the Catholic Church*.

37.     Accordingly, non-Catholics to whom the privilege of being part of The Lyceum is extended and whose religious beliefs and practices run counter to Church teaching might experience possible conflicts as The Lyceum maintains mission integrity.

38.     Sincere questioning of the practices of the Catholic faith in order to more deeply understand them are welcome.

39.     But openly hostile, public defiance and challenge of Catholic truths or morality (including the Church's teachings on marriage and human sexuality) are signs that a student, parent, staff, or faculty member are not a fit for The Lyceum's evangelical mission and may be denied admission or asked to leave The Lyceum.

40.     The Lyceum is located in the Roman Catholic Diocese of Cleveland and the Byzantine Catholic Eparchy of Parma.

41.     The school leases space from the Diocese on the Sacred Heart of Jesus Parish Campus.

42.     The lease provides, in relevant part: "Lessee shall not use, or permit the Premises to be used, in any manner that is contradictory to the teachings or mission of the Roman Catholic Church, that promotes the espousal of any particular belief or viewpoint that is contradictory to the teachings of the Roman Catholic Church as determined by the Bishop of Cleveland, or that is otherwise injurious to the reputation of Sacred Heart of Jesus Parish, the Diocese of Cleveland, or the Bishop of the Diocese of Cleveland."

43.     The Lyceum is an independent school, governed by a Catholic board of directors who are committed to a Catholic vision of classical education.

44.     The Lyceum's motto is "Fiat lux," which means "Let there be light."

45.     The school believes that a classical Catholic liberal arts education enables a person to seek the light of truth, especially "the truth of the Gospel of Jesus Christ and His Church."

46.     In keeping with its religious convictions, The Lyceum's curriculum is ordered by and ordered to the study of theology ("the queen of the sciences").

47.     This study of theology is based on the Holy Scriptures, Catholic Tradition, the *Catechism of the Catholic Church*, the Magisterium, the Church Fathers, Doctors of the Church, and Catholic authors.

48.     The school integrates Catholic faith and theology in all of its classes; no subject is divorced from the teachings of the Catholic Church.

49.     The Lyceum's Catholic emphasis is not limited to students' intellectual life, but also forms students in their devotional life, specifically through the liturgy of the Catholic Church.

50.     Students begin each school day singing and reciting lauds (a service of morning prayer) in Latin and English.

51.     Each class begins and ends with prayer.

6

52.     Every Thursday morning, The Lyceum (including faculty, staff, and students) attends Holy Mass or the Divine Liturgy of the Byzantine Rite.

53.     The Lyceum participates in those liturgical celebrations by singing sacred music.

54.     Daily Mass is available to students during the lunch hour at St. Gregory's Church of the Sacred Heart of Jesus Parish, next door to The Lyceum.

55.     The Lyceum attends Holy Mass or the Divine Liturgy on Catholic holy days.

56.     As a classical education program, the Lyceum infuses the Seven Liberal Arts, the trivium (grammar, logic, and rhetoric), and the quadrivium (arithmetic, geometry, astronomy, and music) into its curriculum.

57.     It does so to order the students' minds, allowing them to think critically and to discern what is good, true, and beautiful in the world in which they live.

58.     The Lyceum employs the Socratic method, a discussion-focused (rather than lecture-focused) style of teaching.

59.     The school, throughout its curriculum, has students read directly from primary sources rather than textbooks.

60.     All of The Lyceum's students participate in the "Schola Cantorum," (school of singers) which emphasizes the skill of choral singing and sacred liturgical music.

61.     The Lyceum's students also participate in drama, performing Greek tragedy and Shakespearean comedy.

**The Lyceum's School Admissions Policies and Practices**

62.     The Lyceum currently has 53 students enrolled for the 2018-2019 academic year.

63.     Admission to The Lyceum is selective and based upon compatibility with the school's Catholic faith and mission, previous school records, personal interviews, teacher recommendations, and standardized testing.

64.     The Lyceum accepts non-Catholic students.

65.     Any student who disagrees with the teachings of the Catholic Church or whose parents disagree with these teachings may be denied admission to or be required to withdraw from The Lyceum.

66.     Because of the school's uniquely Catholic and classical approach to education, The Lyceum draws students from outside Ohio.

67.     The Lyceum has enrolled approximately a dozen out-of-state students over the course of the last six years.

68.     The Lyceum has previously been asked to enroll a student whose family disagreed with Catholic beliefs and teaching, and The Lyceum did not allow the family to enroll.

69.     Additionally, in the summer of 2018, The Lyceum was contacted by a woman who inquired about enrolling her child but expressed disagreement with The Lyceum's belief that biological sex is a fixed and immutable reality gifted by God to reflect His image.

70.     The Lyceum would not allow the family to enroll.

**The Lyceum's Employment Practices and Policies**

71.     The Lyceum employs, for compensation, seven full-time tutors.

72.     The school also employs, for compensation, two part-time tutors.

73.     All employees must be committed to the Catholic identity and mission of The Lyceum.

**The City of Euclid's Nondiscrimination Ordinance**

74.     On April 9, 2018, the City Council of the City of South Euclid passed Ordinance No. 12-17 ("Ordinance").  *See* South Euclid Code of Ordinances, Chapter 552, *attached as* Exhibit 1.

75.     The Ordinance prohibits discrimination based on religion, creed, marital status, sexual orientation, and gender identity or expression (among other things) in employment, housing, and public accommodations. *See id.* § 552.01, *et seq.*

76.     The Ordinance defines "discrimination" as "any act, policy or practice that, regardless of intent, has the effect of subjecting any person to differential treatment" as a result of that person's religion, creed, marital status, sexual orientation, gender identity, or gender expression, among other things. *See id.* § 552.01(e).

77.     The Ordinance defines "gender" as "actual or perceived sex." *Id.* § 552.01(i).

78.     The Ordinance defines "gender identity or expression" as "having or being perceived as having a gender identity or expression whether or not that gender identity or expression is different from that traditionally associated with the sex assigned to that individual at birth." *Id.* § 552.01(j).

79.     The Ordinance defines sexual orientation as "actual or perceived heterosexuality, homosexuality or bisexuality." *Id.* § 552.01(o).

80.     The Ordinance defines public accommodations as:

inns, taverns, hotels, motels, restaurants, wholesale outlets, retail outlets, banks, savings and loan associations, other financial institutions, credit information bureaus, insurance companies, dispensaries, clinics, hospitals, theaters, recreational parks and facilities, trailer camps, garages, public halls, and all other establishments which offers goods, services, accommodations and entertainment to the public within the City.  A place of public accommodation does not include any institution, club or other place of accommodation, which by its nature is distinctly private.

*Id.* § 552.01(n).

81.     The Ordinance does not define religion or creed.

82. The Ordinance defines "employer" as "any person who, for compensation, regularly employs four or more individuals, not including the employer's parents, spouse or children." *Id.* § 552.01(h).

83. The Ordinance states that an employer may not "print or publish, or cause to be printed or published, any discriminatory notice or advertisement relating to employment." *Id.* § 552.02(f).

84. The Ordinance states that a public accommodation may not "print, publish, circulate, post, or mail, directly or indirectly, a statement, advertisement, or sign . . . which indicates that an individual's patronage of, or presence at, the business establishment or place of public accommodation is objectionable, unwelcome, unacceptable or undesirable." *Id.* § 552.04(b).

85. The Ordinance contains a number of exceptions to its nondiscrimination requirements, including for certain promotional activities, affirmative action plans, and business purposes.

86. The promotional activities exception reads as follows: "Unless otherwise prohibited by law, nothing contained in this chapter shall be construed to prohibit promotional activities such as senior citizen discounts and other similar practices designed primarily to encourage participation by [a] protected group." *Id.* § 552.06(b).

87. The bona fide occupational exception reads as follows:

Nothing contained in this chapter shall be deemed to prohibit selection or rejection based solely upon a bona fide occupational qualification or a bona fide physical requirement. Nothing contained in this chapter shall be deemed to prohibit a religious or denominational institution from preferring to employ an individual of a particular religion to perform work connected with the performance of religious activities by the institution. If a party asserts that an otherwise unlawful practice is justified as a permissible bona fide occupational qualification, or a permissible bona fide physical requirement, that party shall have the burden of proving:

(1) That the discrimination is in fact a necessary result of such a bona fide condition; and

(2) That there exists no less discriminatory means of satisfying the bona fide requirement

10

> If a party asserts that an otherwise lawful practice is justified as a permissible bona fide religious or denominational preference, that party shall have the burden of proving that the discrimination is in fact a necessary result of such a bona fide condition.

*Id.* §§ 552.06(e)-(f).

88.     The Ordinance does not contain a religious exemption.

89.     As a result, the Ordinance—and specifically its public accommodations and employment provisions—applies to faith-based institutions regardless of religious status.

90.     Initial drafts of the Ordinance included an exemption for religious organizations, but that exemption was removed from the final text of the Ordinance.

91.     The Ordinance created a Civil Rights Review Board, which has authority to enforce the Ordinance. *See id.* § 552.09.

92.     The Civil Rights Review Board can enforce the Ordinance through investigation and conciliation. *See id.* §§ 552.13-14.

93.     If the Board finds that the Ordinance was violated, it may issue a cease-and-desist order, recommend court proceedings, recommend license revocation, or order payment of civil penalties, damages, attorneys' fees, or costs. *See id.* § 552.19.

94.     Any person may file a complaint with the Civil Rights Review Board, alleging a past, ongoing, or future violation of the Ordinance. *See id.* § 552.11.

95.     The Ordinance also authorizes the City, "the complainant, or any person aggrieved by a violation" to bring a lawsuit in court instead of bringing a complaint to the Board. *See id.* § 552.20.

96.     Persons authorized to bring a lawsuit may seek injunctive relief, compensatory or punitive damages, and attorneys' fees and costs. *See id.*

97.     Violations of the Ordinance are third degree misdemeanors.  *See id.* § 552.99.

98. Under Ohio law, third degree misdemeanors are punishable by up to five hundred dollars in fines, restitution, or up to sixty days in jail. *See* Ohio Rev. Code Ann. § 2929.28(A) (fines, restitution), § 2929.24(A)(3) (jail).

99. Upon information and belief, the City of South Euclid's Ordinance was not prompted by evidence of widespread discrimination in South Euclid.

100. The Ordinance was prompted by the advocacy efforts of Equality Ohio. *See, e.g.,* Regular Meeting of South Euclid City Council, July 10, 2017 Meeting Minutes, *available at* https://www.cityofsoutheuclid.com/wp-content/uploads/2017/07/CouncilMinutes07-10-17.pdf (*last visited* March 28, 2019).

101. The City even co-branded a "Nondiscrimination Ordinance FAQs" document with Equality Ohio. *See* Ex. 2.

102. Upon information and belief, the Ordinance was prompted by hostility towards religion and religious beliefs, particularly toward the belief that marriage is exclusively the union of one man and one woman, and the belief that biological sex is immutable.

103. The Lyceum advocated against passage of the Ordinance at South Euclid City Council meetings, raising serious constitutional concerns.

104. In December 2017, The Lyceum (through counsel) sent a letter to the Mayor and City Council, notifying them that the proposed Ordinance would violate the legally protected rights of the school and other similarly situated institutions. *See* December 11, 2017, Letter from Greg Baylor to South Euclid Mayor and City Council, *attached as* Ex. 3.

105. In May 2018, The Lyceum sent a public records request to the City, attempting to obtain communications between Equality Ohio and the South Euclid City Council.

106.     In violation of Ohio's public records law, the City has not responded to The Lyceum's public records request.

**The Lyceum Likely Violates the City of South Euclid's Ordinance**

107.     The Lyceum is located within the city of limits of South Euclid, Ohio.

108.     The Lyceum, for compensation, regularly employs more than four full-time employees who are not family members.

109.     The Lyceum is a covered employer under the Ordinance.

110.     The Lyceum cannot be certain whether its employment decisions might be exempted under the bona fide occupational exception.

111.     The Lyceum is unclear about what "connected with the performance of religious activities" means or what employment positions it may apply to.

112.     At least one Lyceum employee performs an administrative role that does not involve verbal communication of the Catholic faith but who is expected to provide a Catholic witness by example to The Lyceum students with whom she is in continual contact.

113.     The Lyceum cannot be certain whether it is a covered "business establishment or place of public accommodation" under the Ordinance.

114.     The Lyceum welcomes members of the general public to apply for admission to its school.

115.     But admission to The Lyceum is selective and based upon agreement with the Catholic mission and faith of the school, previous school records, personal interviews, teacher recommendations, and standardized testing.

116.     The Lyceum has attempted to gain clarification from the City regarding whether the Ordinance covers The Lyceum and its policies and practices.

117.     On February 1, 2019, The Lyceum sent a letter to the City and Mayor regarding Chapter 552's application to a religious school. *See* February 1, 2019, Letter from The Lyceum to the South Euclid Mayor and Law Director, *attached as* Ex. 4.

118.     Specifically, The Lyceum asked whether Chapter 552 of the City Code of Ordinances applies to The Lyceum, especially with respect to the employment and public accommodations/business establishment provisions.

119.     On February 5, 2019, City Law Director Michael Lograsso responded that he could not advise The Lyceum regarding whether the Ordinance applies to the school, or not. *See* February 5, 2019, Email from City Law Director to The Lyceum, *attached as* Ex. 5.

120.     As a result, The Lyceum has no way of knowing whether it is subject to the Ordinance and its criminal penalties.

121.     In light of the Ordinance, The Lyceum has drafted a policy which explains these beliefs and their implications for the school's community, and provides in part:

> Because our efforts at integral formation include the integrity of body, spirit, and moral development, The Lyceum has a proper concern for each student's behavior and development in the complex area of human sexuality. As a Catholic institution, we believe that human bodies are gifts from God and temples of the Holy Spirit. All men and women are called to a life of chastity appropriate to their vocation as single, married, or consecrated religious. The Church defines chastity as "the successful integration of sexuality within the person and thus the inner unity of man in his bodily and spiritual being."
>
> The Church also teaches that "sexuality, in which man's belonging to the bodily and biological world is expressed, becomes personal and truly human when it is integrated into the relationship of one person to another, in the complete and lifelong mutual gift of a man and a woman." We believe that human sexual behavior is only properly oriented to the ends of love and life in the context of Holy Matrimony.
> ….
>
> We believe that the body and soul are intimately united: the body does not contain the soul like water in a glass, but the two are intimately dependent upon each other to express man as the highest order of creation. We believe that the sexes are complementary and that as "male and female he made them." Our given biological

sex is part of the divine plan. The Church teaches that sexual identity is "a reality deeply inscribed in man and woman," it constitutes but is more than one's biological identity, and a person "should acknowledge and accept his sexual identity". One's biological sex and gender expression are not to be disaggregated, but should be seen in harmony, according to God's plan.

….

Behaviors that are contrary to Catholic morality and the expectations of this school include but are not limited to: vulgar language and gestures of a sexual nature, immodest dress or deportment, expressions of lust, masturbation, pornography, fornication, homosexual activity, expressing a gender that is discordant with one's biological sex, adultery, cohabitating in a sexual relationship outside of marriage, voluntary sterilization, artificial contraception, in vitro fertilization, procuring an abortion, and sexual harassment or abuse.

*See* "Catholic Educational Mission and Community Policies" (sexuality policy), *attached as* Ex. 6.

122.   The Lyceum has also drafted an employment statement for its website, which provides:

The Lyceum, as a distinctly Catholic school, hires faculty who, in belief and practice, are committed to the teachings of the Catholic Church as set forth by the Magisterium and as articulated in the *Catechism of the Catholic Church*. The Lyceum's faculty contributes not only to students' intellectual life, but also forms students in their devotional life, so fidelity to Catholic beliefs is imperative to employment at The Lyceum.

*See* "The Lyceum Statement on Employment," *attached as* Ex. 7.

123.   However, The Lyceum's board of trustees has not formally adopted the sexuality policy or the employment statement due to the Ordinance's ban on discrimination in employment and public accommodations based on religion, creed, marital status, sexual orientation, and gender identity or expression. *See* Affidavit of Richard J. Wall, Jr., *attached as* Ex. 8.

124.   The Lyceum wants to publish the sexuality policy and the employment statement on its website, www.TheLyceum.org. *See id.*

15

125.    The Lyceum reasonably fears that formally adopting and publishing the written sexuality policy and employment statement would violate the Ordinance, subjecting The Lyceum to damages, costs, legal fees, and other remedial action.

126.    Were it not for the Ordinance, The Lyceum's board of trustees would immediately pass the sexuality policy and employment statement and post them to the school's website.

127.    The Lyceum reasonably fears that students or their parents who disagree with the school's Catholic beliefs and conduct expectations will apply for admission to the school.

128.    The Lyceum reasonably fears that individuals who disagree with the school's Catholic beliefs and conduct policies will seek employment at The Lyceum.

129.    Nevertheless, The Lyceum will not violate its deeply-held Catholic beliefs.

130.    The Lyceum will not hire or retain employees if they reject – by stated belief or conduct – the Catholic Church's teachings, including its teachings on marriage, sexual identity, and sexual ethics.

131.    Nor will The Lyceum permit students or their parents or guardians to join or remain part of the school community if they reject – by stated belief or conduct – the Catholic Church's teachings, including its teachings on marriage as the union of one man and one woman, sexual identity, and sexual ethics.

132.    Moreover, The Lyceum will not permit employees, students, or parents or guardians to join or remain part of the school community if they wish to adopt a gender identity at variance with their sex.

133.    The Lyceum will not permit sex-specific facilities to be accessed by members of the opposite sex, regardless of gender identity.

16

134. In its leased space, The Lyceum has two multi-user facilities for female students and one multi-user facility for male students.

135. The Lyceum also has two single user faculty restrooms.

136. Students are only eligible to participate on The Lyceum's sex-specific athletic teams and gym classes consistent with their biological sex, regardless of gender identity or expression.

137. The Lyceum reasonably fears that its existing practices do violate, and that its desired speech and conduct will violate the Ordinance, subjecting The Lyceum to damages, costs, legal fees, and other remedial action.

138. The Lyceum reasonably fears that the Ordinance is an existential threat to its existence, forcing the school to choose between its religious convictions and shutting its doors.

## ALLEGATIONS OF LAW

139. All acts of the Defendant, its officers, agents, servants, employees, or persons acting at their behest or direction, were done and are continuing to be done under the color and pretense of state law.

### First Cause of Action: Violation of the Free Exercise Clause of the First Amendment to the U.S. Constitution

140. The Plaintiff realleges each allegation contained in ¶¶ 1-139 of this Complaint and incorporates them herein.

141. The Ordinance provisions, facially and as-applied to The Lyceum, violate The Lyceum's right to free exercise of religion under the First Amendment to the United States Constitution.

142. The Lyceum's sincerely held religious beliefs include beliefs that there are two immutable and complementary sexes; that marriage is the consensual, lifelong, exclusive union of one man and one woman; and that sexual relations must be reserved for marriage.

17

143.    The Lyceum's religious beliefs about biological sex, marriage, and human sexuality and related practices are based on Holy Scripture and the teachings of the Roman Catholic Church.

144.    The Lyceum's religious beliefs about biological sex, marriage, and human sexuality are summarized in its Catholic Educational Mission and Community Policies. *See* Ex. 6.

145.    The Lyceum's religious beliefs—including its religious beliefs about biological sex, marriage, and human sexuality—are the foundation for its employment, admissions, and facility use policies.

146.    The Lyceum will not hire employees if they reject – by stated belief or conduct – the Catholic Church's teachings, including its teachings on marriage as exclusively the union of one man and one woman, sexual identity, and sexual ethics.

147.    Nor will The Lyceum permit students or their parents or guardians to join or remain part of the school community if they reject – by stated belief or conduct – the Catholic Church's teachings, including its teachings on marriage as the union of one man and one woman, sexual identity, and sexual ethics.

148.    Moreover, The Lyceum will not permit employees, students, or parents or guardians to remain part of the school community if they wish to adopt a gender identity at variance with their sex.

149.    The Lyceum will not permit sex-specific facilities to be accessed by members of the opposite sex, regardless of gender identity.

150.    Students are only eligible to participate on The Lyceum's sports teams consistent with their biological sex, regardless of gender identity.

151.    The Lyceum's continued compliance with its religious beliefs in its employment, admissions, and facility use is religious exercise under the First Amendment.

152.    The First Amendment protects The Lyceum's right to freely exercise its religion.

153.    The First Amendment protects the belief that marriage is the union of one man and one woman. *See, e.g., Obergefell v. Hodges*, 135 S. Ct. 2584, 2607 (2015); *see also Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018).

154.    The First Amendment protects The Lyceum from government hostility, targeting, and discrimination because of its religious beliefs and practices.

155.    The City's passage and implementation of The Ordinance targets, shows hostility towards, and discriminates against The Lyceum because of its religious beliefs and practices.

156.    The Ordinance is neither neutral nor generally applicable because it contains multiple exceptions, for among other things, discrimination based on business necessity, affirmative action programs, and promotional activities for protected groups, yet imposes special disabilities on The Lyceum due its religious beliefs about biological sex, marriage, and human sexuality. *See* Ex. 1, City of South Euclid Code of Ordinances § 552.06.

157.    Laws that violate religious exercise rights as well as other constitutional rights are also subject to strict scrutiny.

158.    Absent its fear of investigation and prosecution under the Ordinance, The Lyceum would immediately announce and promote its Catholic Educational Mission and Community Policies.

159.    The Ordinance imposes severe coercive pressure, including jail time, on The Lyceum to change or violate its religious beliefs and chills, deters, and restricts The Lyceum's religious exercise by suppressing its religiously motivated messages and practices.

160.    Plaintiffs currently suffer the ongoing harm of self-censorship of their desired, protected free exercise rights in order to avoid investigation and prosecution under The Ordinance.

161.    The Ordinance substantially burdens The Lyceum's religious exercise.

19

162.    Because the Ordinance substantially burdens The Lyceum's free exercise rights, the Ordinance must further a compelling government interest in a narrowly tailored way.

163.    The City has no compelling interest that is served by infringing on The Lyceum's religious exercise rights, nor can any such interest be achieved by the least restrictive means available.

164.    Thus, the Ordinance violates The Lyceum's' right to free exercise of religion under the First Amendment to the United States Constitution as incorporated and applied to the States through the Fourteenth Amendment.

### Second Cause of Action: Violation of the Free Speech Clause of the First Amendment to the U.S. Constitution

165.    Plaintiff realleges each allegation contained in ¶¶ 1-139 of this Complaint and incorporates them herein.

166.    The Ordinance provisions, on their face and as-applied, are an unconstitutional abridgment of The Lyceum's free speech because they: 1) are content-based speech restrictions; 2) are viewpoint-based speech restrictions; 3) compel The Lyceum to speak messages that violate its religious beliefs; and 4) force The Lyceum to engage in self-censorship.

167.    Religious speech is fully protected by the First Amendment.

168.    The Lyceum engages in religious speech in every aspect of its educational mission and operations.

169.    This religious speech includes disseminating Catholic teaching on biological sex, marriage, and human sexuality, and extends to classroom instruction, school website postings, employment policies, community conduct standards, and admissions and retention policies.

**The Ordinance is Content-Based**

170.    The Ordinance contains two provisions that restrict speech, for both employers, § 552.02(f), and public accommodations, § 552.04(b) (collectively, the publication bans).

171.    The Ordinance states that an employer may not "print or publish, or cause to be printed or published, any discriminatory notice or advertisement relating to employment."  § 552.02(f).

172.    The Ordinance states that a public accommodation may not "print, publish, circulate, post, or mail, directly or indirectly, a statement, advertisement, or sign . . . which indicates that an individual's patronage of, or presence at, the business establishment or place of public accommodation is objectionable, unwelcome, unacceptable or undesirable."  § 552.04(b).

173.    The Ordinance draws distinctions based on the idea or message a speaker conveys.

174.    The Civil Rights Review Board must examine a statement's content to determine whether it is objectionable and so punishable under the Ordinance.

175.    The Ordinance's publication bans are content-based speech restrictions.

176.    Content-based speech restrictions are presumptively unconstitutional and can survive only if they serve a compelling government interest that is advanced by the least restrictive means available.

177.    The City has no compelling government interest that justifies punishing The Lyceum's protected religious speech.

178.    Any interest the government may have in punishing The Lyceum's protected speech is not advanced in the least restrictive means available, nor is it narrowly tailored.

**The Ordinance is Viewpoint-Based**

179.    The Ordinance permits religious schools and others to distribute and disseminate religious and non-religious statements that, for example, promote same-sex marriage, or support or condone policies permitting access to restrooms and showers based on one's gender identity,

21

but punishes religious statements that promote only Catholic teaching on marriage and sexuality, or that support or condone access to restrooms and showers based solely on one's biological sex.

180.     The Ordinance's preference for certain religious statements that favor, among other things, same-sex marriage, and access to restrooms and showers based on gender identity, while punishing religious statements conditioning access on biological sex, violates the First Amendment's Free Speech Clause, which prohibits viewpoint discrimination.

181.     Viewpoint-based speech restrictions are presumptively unconstitutional.

**The Ordinance Compels Speech**

182.     Through the threat of sanctions and jail time, the Ordinance compels The Lyceum to communicate two distinct government messages: 1) that The Lyceum's restrooms and athletic teams are open to persons of the opposite biological sex, and 2) that The Lyceum's community is open to persons who reject (by belief, conduct, or both) Catholic teaching on marriage and human sexuality.

183.     The Lyceum objects to both messages.

184.     It believes that its school should be operated in a manner consistent with its religious beliefs, including beliefs that there are two immutable and complementary sexes, that marriage is the consensual, lifelong, exclusive union of one man and one woman, and that sexual relations must be reserved for marriage.

185.     Government-compelled speech is subject to strict scrutiny.

186.     The City lacks a compelling interest to force The Lyceum to communicate its favored messages, nor does the compulsion of speech serve any interest the government may possess in the least restrictive means available, nor is it narrowly tailored.

**The Ordinance Results in Self-Censored Speech**

187.    The Lyceum has refrained from declaring the teaching of Holy Scriptures and the Roman Catholic Church regarding God's design of two immutable and complementary sexes, institution of marriage, and related requirements for sexual conduct in its school website postings, and formal, written employment policies, community conduct standards, admissions and retention policies, and public statements from school officials.

188.    The Lyceum's Board of Trustees has agreed upon Catholic Educational Mission and Community Policies and the Statement on Employment for adoption, followed by distribution and dissemination to its members and to the public, but has declined to adopt, implement, distribute, or disseminate the Policies and Statement out of a reasonable fear that the Civil Rights Review Board and the City would prosecute it for doing so.

189.    The Ordinance's imposition of sanctions on public statements that may be viewed as unwelcome in violation of the publication bans, places a direct and substantial burden on The Lyceum's free speech rights, including the school's freedom to teach its religious beliefs regarding God's design for human sexuality and to publicly distribute and implement its related policy and employment statement.

190.    The Lyceum is objectively, reasonably chilled from exercising its First Amendment right to free speech due to the risk of the Board's enforcement of the Ordinance and the substantial penalties available under it.

191.    The Lyceum's free speech rights are violated by the Ordinance, on its face, and as applied to The Lyceum.

192.    Because the Ordinance violates Plaintiff's right to free speech, it must further a compelling interest in a narrowly tailored way.

23

193.    The City has no compelling interest that is served by infringing on The Lyceum's freedom of speech, nor can any such interest be achieved by the least restrictive means available.

194.    Thus, the Ordinance violates The Lyceum's right to free speech under the First Amendment to the United States Constitution as incorporated and applied to the States through the Fourteenth Amendment.

### Third Cause of Action: Violation of the Right to Expressive Association of the First Amendment to the U.S. Constitution

195.    Plaintiff realleges each allegation contained in ¶¶ 1-139 of this Complaint and incorporates them herein.

196.    The Lyceum engages in extensive expressive activity as a religious school.

197.    The Lyceum has a strong theological interest in engaging in communal expression that reflects fidelity to Catholic teachings on biological sex, marriage, and human sexuality.

198.    The Lyceum also has a strong theological interest in ensuring that members of its community hold and maintain fidelity to Catholic teachings on biological sex, marriage, and human sexuality.

199.    The First Amendment protects the right of persons to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.

200.    The First Amendment bars the government from compelling persons to expressively associate with others in the process of creating and disseminating speech.

201.    The First Amendment also prohibits the government from banning people from expressively associating with others in the process of creating and disseminating speech.

202.    The Lyceum engages in expressive association when it hires faculty or other employees, admits students, or otherwise seeks to maintain a religious community formed around shared theological convictions and conduct standards.

24

203.    The Ordinance harms Plaintiff's ability to promote its religious beliefs about biological sex, marriage, and human sexuality by requiring them to either decline to associate with persons who share their expressive purpose of promoting their religious beliefs, or to willingly associate with persons who hold or desire to promote views of biological sex, marriage, or human sexuality that directly contradict The Lyceum's own.

204.    Absent its fear of investigation and prosecution under the Ordinance, The Lyceum would immediate announce, promote, and implement its Catholic Educational Mission and Community Policies and Statement on Employment.

205.    The Ordinance imposes severe coercive pressure, up to and including jail time, on The Lyceum to change or violate its religious beliefs and chills, deters, and restricts The Lyceum's expressive association by suppressing its religiously motivated messages and practices.

206.    Plaintiffs currently suffer the ongoing harm of self-censorship of their desired, protected expressive association in order to avoid prosecution under The Ordinance.

207.    Because the Ordinance violates Plaintiff's right to expressive association, it must further a compelling interest in a narrowly tailored way.

208.    The City has no compelling interest that is served by infringing on The Lyceum's expressive associational rights, nor can any such interest be achieved by the least restrictive means available.

209.    Thus, the Ordinance violates The Lyceum's right to expressive association under the First Amendment to the United States Constitution as incorporated and applied to the States through the Fourteenth Amendment.

**Fourth Cause of Action: Violation of the Due Process Clause
of the Fourteenth Amendment to the U.S. Constitution**
*(Void for Vagueness)*

210.    Plaintiff realleges each allegation contained in ¶¶ 1-139 of this Complaint and incorporates them herein.

211.    The Fourteenth Amendment to the United States Constitution guarantees The Lyceum the right to due process of law.

212.    The Fourteenth Amendment prohibits Defendants from censoring speech or penalizing behavior based on vague standards.

213.    Laws that interfere with First Amendment freedoms require a high level of specificity.

214.    Laws that impose criminal penalties require a high level of specificity.

215.    The Ordinance defines public accommodations to include "all . . . establishments which offers goods, services, accommodations and entertainment to the public within the City", but not an "institution, club or other place of accommodation, which by its nature is distinctly private." Ex. 1, City of South Euclid Code of Ordinances § 552.01(n).

216.    The Ordinance does not define the vague phrase "by its nature is distinctly private."

217.    The Ordinance does not offer any narrowing context for the phrase "by its nature distinctly private."

218.    It is unclear whether schools, including private schools such as The Lyceum, are public accommodations under the Ordinance.

219.    The Ordinance also fails to sufficiently define the vague terms "gender identity or expression."

220.    The Ordinance insufficiently defines "gender identity or expression" as "having or being perceived as having a gender identity or expression whether or not that gender identity or

26

expression is different from that traditionally associated with the sex assigned to that individual at birth." *See id.* § 552.01(j).

221. This definition is circular; it states that a person's gender identity or expression may differ from that person's sex, but does not explain what gender identity and gender expression mean.

222. According to some internet sources, there are over 100 gender identities and expressions.

223. It is impossible to know what a person's gender identity or expression may be, or how it applies.

224. The Ordinance states that a public accommodation may not "print, publish, circulate, post, or mail, directly or indirectly, a statement, advertisement, or sign . . . which indicates that an individual's patronage of, or presence at, the business establishment or place of public accommodation is objectionable, unwelcome, unacceptable or undesirable." *See id.* § 552.04(b).

225. The Ordinance does not define the vague terms "objectionable, unwelcome, unacceptable or undesirable."

226. The Ordinance offers no narrowing context for the terms "objectionable, unwelcome, unacceptable or undesirable."

227. The terms "objectionable, unwelcome, unacceptable or undesirable" have no settled legal meaning.

228. As a result, neither The Lyceum nor anyone else can know what statements might qualify as "objectionable, unwelcome, unacceptable or undesirable."

229. The Ordinance states that "[n]othing contained in this chapter shall be deemed to prohibit a religious or denominational institution from preferring to employ an individual of a

particular religion to perform work connected with the performance of religious activities by the institution." *Id.* § 552.06(e).

230. The Ordinance goes on to state: "If a party asserts that an otherwise lawful practice is justified as a permissible bona fide religious or denominational preference, that party shall have the burden of proving that the discrimination is in fact a necessary result of such a bona fide condition." *Id.* § 552.06(f).

231. The Ordinance does not define or offer a narrowing context for the vague terms "individual of a particular religion," "perform work connected with the performance of religious activities by the institution," "bona fide religious or denominational preference," or "necessary result of such a bona fide condition."

232. As a result, The Lyceum cannot know whether the bona fide religious or denominational preference applies to its employment decisions.

233. The Lyceum and its leaders are left to guess which statements and practices will violate the Ordinance, and so may differ in their understanding as to what constitutes: 1) a public accommodation, 2) discrimination based on sexual orientation, gender identity, or gender expression, 3) statements indicating that a person's presence is "objectionable, unwelcome, unacceptable or undesirable" and 4) a bona fide religious or denominational preference.

234. The Ordinance provides no warning or notice as to what the terms described above mean, and therefore, what conduct and expression will and will not be penalized under the Ordinance.

235. The Lyceum's board of trustees have agreed upon written policies consistent with The Lyceum's religious beliefs regarding human sexuality, but have refrained from formally adopting and publishing those policies out of the reasonable fear of the publication bans.

236.     The Lyceum fears that publishing its Catholic Educational Mission and Community Policies and its Statement on Employment will subject it to enforcement proceedings and substantial penalties.

237.     Any person claiming to be aggrieved by The Lyceum's actions can file a complaint with the City's Civil Rights Review Board.

238.     Both the City itself and any person claiming to be aggrieved by The Lyceum's actions can file a complaint in court instead of going through the administrative process.

239.     The Ordinance is thus vague facially and as applied to The Lyceum, and accordingly violates the Fourteenth Amendment's Due Process Clause.

**Fifth Cause of Action: Violation of the Due Process Clause**
**of the Fourteenth Amendment to the U.S. Constitution**
**(*Parental Rights*)**

240.     Plaintiff realleges each allegation contained in ¶¶ 1-139 of this Complaint and incorporates them herein.

241.     Religious schools are protected by the Due Process Clause of the Fourteenth Amendment from the government's unwarranted interference with the rights of parents, and the rights of the school selected by parents, to direct the upbringing and education of the parents' children.

242.     The Ordinance, as applied, deprives the students' parents of fair opportunity to procure for their children instruction consistent with their sincerely held religious beliefs concerning biological sex, marriage, and human sexuality and that they have selected, at least in part, for religious reasons.

243.     The Fourteenth Amendment protects The Lyceum from deprivation of its property rights without due process of law.

244. The right to conduct schools in a certain manner is a due process right under *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510 (1925).

245. Parents and guardians, as a part of their liberty, may direct the education of their children by selecting schools that are intentionally Catholic and affirm Catholic teachings on biological sex, marriage, and human sexuality.

246. The Ordinance infringes on the rights of The Lyceum to conduct its school in a distinctly religious manner consistent with its Catholic beliefs.

247. The Ordinance infringes on the rights of parents to choose Catholic schools where their children will receive a distinctly Catholic education.

248. The Ordinance therefore violates the Fourteenth Amendment.

### Sixth Cause of Action: Violation of the Free Exercise of Religion
### Ohio Constitution Article I, Section 7

249. Plaintiff realleges each allegation contained in ¶¶ 1-139 of this Complaint and incorporates them herein.

250. The Ordinance provisions, facially and as-applied to The Lyceum, violate The Lyceum's right to free exercise of religion as guaranteed by Article I, Section 7 of the Ohio Constitution.

251. Ohio's free exercise provision offers greater protection to religious exercise than the First Amendment to the U.S. Constitution.

252. The Lyceum's sincerely held religious beliefs include beliefs that there are two immutable and complementary sexes; that marriage is the consensual, lifelong, exclusive union of one man and one woman; and that sexual relations must be reserved for marriage.

253.    The Ordinance substantially burdens The Lyceum's sincerely held religious beliefs because it forces the school to choose between adhering to its religious beliefs regarding marriage and human sexuality, or suffering severe fines and even jail time.

254.    Because the Ordinance substantially burdens The Lyceum's free exercise rights, it must further a compelling government interest in a narrowly tailored way.

255.    The City has no compelling interest that is served by infringing The Lyceum's religious exercise rights, nor can any such interest be achieved by the least restrictive means available.

256.    Thus, the Ordinance violates The Lyceum's right to free exercise of religion under Ohio Constitution Article I, Section 7.

## PRAYER FOR RELIEF

WHEREFORE, The Lyceum prays for judgment as follows:

1.    That this Court enter a preliminary and permanent injunction restraining The City of South Euclid, its officers, agents, employees, and all others acting in concert with them, from enforcing or applying South Euclid, Ohio, Code § 552.01 *et. seq.* to prohibit or chill The Lyceum's statements and policies regarding its religious beliefs about biological sex, marriage, and human sexuality;

2.    That this Court enter a declaratory judgment declaring that South Euclid, Ohio, Code § 552.01 *et. seq.* violates the First and Fourteenth Amendments of the United States Constitution both facially and as applied;

3.    That this Court issue the requested injunctive relief without a condition of bond or other security being required of Plaintiff;

4.    That this Court award Plaintiff damages;

5.     That this Court award Plaintiff's costs and expenses, including its attorneys' fees, pursuant to 42 U.S.C. § 1988; and

6.     For such other relief as the Court deems just and equitable.

Dated this 3rd day of April, 2019.

Respectfully submitted,

_s/ Matthew M. Nee_

Matthew M. Nee
Ohio Bar No. 0072025
NEE LAW FIRM, LLC
Regency Centre
26032 Detroit Road, Suite 5
Westlake, OH 44145
Telephone: (440) 793-7720
Facsimile: (440) 793-7920
Email: Matt@NeeLawFirm.com

David A. Cortman*
Georgia Bar No. 188810
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE,
Suite D-1100
Lawrenceville, GA 30043
Telephone: (770) 339-0774
Facsimile: (770) 338-6744
Email: DCortman@ADFlegal.org

Christiana Holcomb*
DC Bar #176922
Christen M. Price*
DC Bar #1016277
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, D.C. 20001
Telephone: (202) 393-8690
Fax: (202) 347-3622
Email: GBaylor@ADFlegal.org
Email: CPrice@ADFlegal.org
Email: CHolcomb@ADFlegal.org

_Counsel for Plaintiff_

_*Pro Hac Vice Motions filed contemporaneously
herewith_

## **VERIFICATION OF COMPLAINT**

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that I have read the foregoing Verified Complaint and the factual allegations thereof and that to the best of my knowledge the facts alleged therein are true and correct.

Executed this __1st__ day of April, 2019.

Luke A. Macik
Headmaster, The Lyceum