# EXHIBIT 3



December 11, 2017

Ms. Georgine Welo, Mayor
Ms. Jane Goodman, Council President
Mr. Dennis Fiorelli, President Pro Tem
Ms. Ruth Gray, Councilperson
Mr. Joseph Frank, Councilperson
Mr. Ed Icove, Councilperson
Mr. Marty Gelfand, Councilperson
Mr. Jason Russell, Councilperson
City of South Euclid
South Euclid Municipal Complex
1349 South Green Road
South Euclid, OH 44121

      Re:    Proposed Ordinance No. 12-17

Dear Mayor Welo and Members of the City Council:

      The undersigned represents The Lyceum with respect to City of South Euclid proposed ordinance No. 12-17. The purposes of this letter are (1) to explain how the proposed ordinance will, if adopted, likely violate the legally protected rights of The Lyceum and similarly situated organizations; and (2) inform the council that The Lyceum will likely file suit against the city and city officials if the council enacts the proposed ordinance in its current form.

      A.    The Proposed Ordinance

      As we understand it, the proposed ordinance would outlaw discrimination in employment, housing, and public accommodations.[1] The Lyceum is concerned about the potential impact of a number of the ordinance's provisions, discussed below.

      Section 552(e) of the proposed ordinance states as follows:

> "Discriminate, discrimination or discriminatory" means any act, policy or practice that, regardless of intent, has the effect of

---

[1] As we understand it, the original version of the ordinance imposed its non-discrimination obligations on educational institutions, but the provision pertaining to educational institutions (Section 552.04) has been removed. Please let us know if this understanding is incorrect.

>subjecting any person to differential treatment as a result of that person's age, race, color, creed, religion, national origin, ancestry, disability, marital status, military status, gender, gender identity or expression, sexual orientation, source of income, ethnic group, or physical characteristic

Section 552(j) provides as follows:

>"Gender identity or expression" means having or being perceived as having a gender identity or expression whether or not that gender identity or expression is different from that traditionally associated with the sex assigned to that individual at birth.

Section 552(p) of the proposed ordinance declares:

>"Sexual orientation" means actual or perceived heterosexuality, homosexuality, or bisexuality.

Section 552.06(e) provides as follows:

>Nothing contained in this chapter shall be deemed to prohibit selection or rejection based solely upon a bona fide occupational qualification or a bona fide physical requirement. Nothing contained in this chapter shall be deemed to prohibit a religious or denominational institution from preferring to employ an individual of a particular religion to perform work connected with the performance of religious activities by the institution. If a party asserts that an otherwise unlawful practice is justified as a permissible bona fide occupational qualification, or a permissible bona fide physical requirement, that party shall have the burden of proving:
>
>>1. That the discrimination is in fact a necessary result of such a bona fide condition; and;
>>2. That there exists no less discriminatory means of satisfying the bona fide requirement.

Section 552.06(f) of the proposed ordinance states:

>If a party asserts that an otherwise unlawful practice is justified as a permissible bona fide religious or denominational preference, that party shall have the burden of proving that the discrimination is in fact a necessary result of such a bona fide condition.

B.    <u>The Lyceum's Employment Policies and Practices</u>

Letter to South Euclid City Council
December 11, 2017
Page 3 of 6

> The Lyceum describes its mission as follows:
>
>> The Lyceum has as its mission nothing less than the formation of a liberally educated Catholic lady or gentleman. Broadly stated, The Lyceum aims to produce graduates who, having been formed by Catholic western civilization, then become bearers and guardians of that civilization. In more specific terms, the Lyceum aims to prepare its students not only for successful performance in excellent colleges, but to prepare students who will be a "leaven" in the world. Most importantly The Lyceum seeks to form students who will become lifelong learners in a joyful pursuit of the Truth who is Christ.
>
> It describes the role of Catholic teaching as follows:
>
>> Aside from regular instruction in Theology from The Catechism of The Catholic Church (as well as from Fathers and Doctors of the Church and excellent Catholic Authors), Lyceum students receive an education that proceeds from an integration of faith and reason. There is no academic subject that is able to be taught divorced from the teachings of the faith or split off from the mind of the church. The school holds fast to the principle that all the sciences, philosophical disciplines, and arts are ultimately handmaidens to Theology. Ultimately to form students who are able to live, defend, and grow in the faith, demands that they study all subjects grounded in the habit of scientific and philosophical thinking that is most properly the mind of the Catholic.

In order to pursue its distinctly religious educational mission, The Lyceum draws its faculty and administrators from among those whose beliefs and behavior support and are consistent with the teachings of the Catholic Church. The Lyceum's leadership draws inspiration for its employment practices from, among other things, <u>The Holy See's Teaching on Catholic Schools</u>, by Archbishop J. Michael Miller, CSB. According to the Holy See, one indicator of a school's authentic catholicity is "the vital witness of its teachers and administrators." Archbishop Miller continues:

> With them lies the primary responsibility for creating a Christian school climate, as individuals and as a community. Indeed, "it depends chiefly on them whether the Catholic school achieves its purpose." Consequently the Holy See's documents pay a great deal of attention to the vocation of teachers and their participation in the Church's evangelizing mission. Theirs is a supernatural calling and not simply the exercise of a profession. "The nobility of the task to which teachers are called demands that, in imitation

of Christ, the only Teacher, they reveal the Christian message not only by word but also by every gesture of their behavior." More than a master who teaches, a Catholic educator is a person who gives testimony by his or her life. . . . To fulfill their responsibility of speaking about the Father, educators in Catholic schools, with very few exceptions, should be practicing Catholics who are committed to the Church and living her sacramental life. . . . When such a policy is ignored, it is inevitable that children will absorb, even if they are not explicitly taught, a soft indifferentism that will sustain neither their practice of the faith nor their ability to imbue society with Christian values. Principals, pastors, school-board members, parents, and bishops share in the serious duty of hiring teachers who meet the standards of doctrine and integrity of life essential to a flourishing Catholic school. The Holy See shares the solicitude of the American bishops about employing teachers with a clear understanding of and commitment to Catholic education. A primary way to foster a school's catholicity is by carefully hiring men and women who enthusiastically endorse its distinctive ethos, for Catholic education is strengthened by witnesses to the gospel.

As well as fostering a Catholic worldview across the curriculum, even in so-called secular subjects, "if students in Catholic schools are to gain a genuine experience of the Church, the example of teachers and others responsible for their formation is crucial: the witness of adults in the school community is a vital part of the school's identity." Children will pick up far more by the example of their educators than by masterful pedagogical techniques, especially in the practice of Christian virtues. In the words of Pope Benedict XVI: The central figure in the work of educating, and especially in education in the faith, which is the summit of the person's formation and is his or her most appropriate horizon, is specifically the form of witness. This witness becomes a proper reference point to the extent that the person can account for the hope that nourishes his life [cf. 1 Pet. 3:15] and is personally involved in the truth that he proposes.

The prophetic words of Pope Paul VI ring as true today as they did more than thirty years ago: "Modern man listens more willingly to witnesses than to teachers, and if he does listen to teachers, it is because they are witnesses." What educators do and how they act are more significant than what they say — inside and outside the classroom. This is how the Church evangelizes. "The more completely an educator can give concrete witness to the model of the ideal person [Christ] that is being presented to the students, the more this ideal will be believed and imitated." Hypocrisy turns off

>today's students. While their demands are high, perhaps sometimes even unreasonably so, if teachers fail to model fidelity to the truth and virtuous behavior, then even the best of curricula cannot successfully embody a Catholic school's distinctive ethos. For example, if teachers and administrators demonstrate the individualistic and competitive ethic that now marks so much public education, they will fail to inspire students with the values of solidarity and community, even if they praise those values verbally. The same can be said about a failure to give clear witness to the Church's teaching on the sanctity of marriage and the inviolability of human life. Catholic educators are expected to be models for their students by bearing transparent witness to Christ and to the beauty of the gospel. If boys and girls are to experience the splendor of the Church, the Christian example of teachers and others responsible for their formation is indispensable, and no effort should be spared in guaranteeing the presence of such witness in every Catholic school.

In light of these teachings, The Lyceum expects its faculty and administrators to respect and follow Catholic teaching regarding sexual morality, marriage, and gender, among other things. It also draws its faculty and administrators from among those who enthusiastically embrace fundamental Catholic theological and doctrinal commitments.

C. <u>Application of the Proposed Ordinance to The Lyceum</u>

The question, then, is whether the proposed ordinance imposes any limits upon the The Lyceum's employment practices described in the proceeding section.

As noted above, Section 552(e) of the proposed ordinance defines "discrimination" to refer to "any act, policy or practice that, regardless of intent, has the effect of subjecting any person to differential treatment" based on one or more of the listed protected characteristics, which include creed, religion, marital status, gender, gender identity or expression, and sexual orientation.

Given this expansive definition, it is conceivable—even likely—that the City will interpret the ordinance to restrain The Lyceum's ability to maintain certain of its current employment practices, especially those that impose belief and conduct expectations upon faculty and administrators.

In light of this, the scope of the exemption set forth in Section 552.06(e) takes on particular importance. The exemption states in part that "[n]othing contained in this chapter shall be deemed to prohibit a religious or denominational institution from preferring to employ an individual of a particular religion to perform work connected with the performance of religious activities by the institution."

Letter to South Euclid City Council
December 11, 2017
Page 6 of 6

This language raises a number of significant questions:

1. Is The Lyceum a "religious or denominational institution"?
2. What functions of The Lyceum, if any, do not constitute "religious activities"?
3. What employee labor, if any, is not "connected with the performance of religious activities by the institution"?
4. What does the phrase "of a particular religion" mean? Does it refer exclusively to adherence to particular beliefs, or does it include behavioral standards as well? Does it permit The Lyceum to decline to employ an individual who is engaged unrepentantly and persistently in homosexual conduct or adultery? Does it permit The Lyceum to require employees to use private facilities consistent with their biological sex (as opposed to their self-perceived "gender identity")?

The ordinance requires an employer invoking the exemption to prove "[t]hat the discrimination is in fact a necessary result of such a bona fide condition." How will the City determine whether alleged discrimination is "necessary" or not?

Given these significant ambiguities, it is likely that the ordinance, if adopted in its current form, will violate The Lyceum's legally protected rights. These include its right of expressive association,[2] its right to select ministerial employees without government interference,[3] and its right to freely exercise its religion, all of which are protected by the First Amendment to the United States Constitution and comparable provisions of the Ohio Constitution. The City's enforcement of the ordinance will almost certainly involve it in impermissible examination of inherently religious questions, something also prohibited by the First Amendment.[4]

In light of the foregoing, The Lyceum respectfully requests that the city council not adopt the proposed ordinance. If the council does elect to adopt the ordinance in its current form, The Lyceum will consider litigation against the city and city officials.[5]

Very truly yours,

*/s Gregory S. Baylor*

Gregory S. Baylor

cc: Luke Macik, Headmaster, The Lyceum

---

[2] *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000); *Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston*, 515 U.S. 557 (1995).
[3] *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012).
[4] *See Colorado Christian Univ. v. Weaver*, 534 F.3d 1245 (10th Cir. 2008).
[5] Such a lawsuit would be filed under 42 U.S.C. § 1983. In section 1983 lawsuits, prevailing plaintiffs are entitled to recover their attorneys' fees and costs. *See* 42 U.S.C. § 1988.