IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **The Lyceum,** Plaintiff | **Case No.** 1:19-cv-731 |
| v. | **Judge:** James S. Gwin |
| **The City of South Euclid,** Defendant. | DEFENDANT'S OPPOSITION to Plaintiff's Motion for Preliminary Injunction |

### INTRODUCTION AND STATEMENT OF FACTS

In 2018, the City of South Euclid ("the City") enacted a comprehensive Anti-Discrimination Ordinance to protect historically marginalized classes, including people of color, ethnic minorities, people with disabilities, and lesbian, gay, bisexual, and transgender (LGBT) individuals from discrimination in housing, public accommodations, and employment. South Euclid Codified Ordinances 552.01 *et seq,* ("Ord.") (also at Exhibit 1 to Plaintiff's Complaint).

Representatives of Plaintiff The Lyceum, a private religious school located in the City, testified at public hearings and asserted in written communications with the City that mandatory compliance with the proposed law's protections of LGBT people would violate Plaintiff's religious beliefs. *See* Cmpl. Ex. 3, 4, and 5; Declaration of Keith Benjamin ("Decl.") ¶14. Plaintiff lobbied the City not to adopt the Ordinance, or alternatively to add a broad religious exemption that would allow discrimination against all of the protected classes of people based on an assertion of religious burden. Decl. ¶¶14-17; Cmpl. Ex. 3. Because such a religious exemption would have nullified the very protections the Ordinance was intended to provide, the City rejected Plaintiff's requests for the broad exemption.

The City's goal, however, was to pass a neutral, narrowly-tailored anti-discrimination law, and therefore it did take steps to mitigate any burden on the religious rights of The Lyceum and

1

others religious organizations. Decl. ¶¶ 7-8; 17. First, the City wrote the Ordinance so that it does not apply to private school admissions. Ord. 552.01(f); *see* Decl. ¶15. Second, the City included several exceptions commonly found in anti-discrimination laws, including an exception allowing religious employers like The Lyceum to exercise their preference to hire ministerial employees who share their religious beliefs. Ord. 552.06(e) and (f); *see* Decl. ¶16. Third, the City defined "public accommodation" in the Ordinance to specifically exclude private schools like The Lyceum from compliance with any of the public accommodation provisions. Ord. 552.01(n).

With no claim of discrimination ever having been filed against it, and despite the potential of being only narrowly—if at all—even subject to the Ordinance, The Lyceum brought this pre-enforcement challenge, claiming injuries as an employer and as a public accommodation. As more fully explained in this brief, Plaintiff's facial and as-applied challenges to the Ordinance are not justiciable, and this Court should deny Plaintiff's Motion for Preliminary Injunction due to Plaintiff's lack of standing and failure to assert any meritorious claims.

## ARGUMENT

A preliminary injunction is "an extraordinary remedy," granted only if the movant satisfies its burden to show "that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566 (6th Cir. 2002). Such relief involves "the exercise of a very far-reaching power," which is appropriate only in limited circumstances. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (internal citation omitted). A preliminary injunction is "never awarded as of right," but only upon careful balancing the relevant factors. *Winter v. NRDC*, 555 U.S. 7, 24 (2008). Those factors are: (1) whether Plaintiff has a strong likelihood of success on the merits; (2) whether Plaintiff would suffer actual, irreparable injury absent an injunction; (3) whether an injunction would cause substantial harm to others; and (4) whether the public interest

is best served by issuance of an injunction. *E.g.*, *Overstreet*, 305 F.3d at 573; *Leary*, 228 F.3d at 736. As explained below, all four factors weigh against an injunction here.

I. **Plaintiff Has Not Brought a Justiciable Case or Controversy Before this Court**

Never having been charged or even threatened with enforcement under the Anti-Discrimination Ordinance, and without alleging facts to suggest it ever *could* be charged, Plaintiff asks for an advisory opinion, which this Court lacks subject-matter jurisdiction to provide.

In constitutional pre-enforcement challenges, the injury-in-fact requirement of Article III standing is only satisfied when a Plaintiff alleges a "credible threat" that the Defendant will enforce the challenged law against it, and when enforcement is "sufficiently imminent." *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 158-9 (2014) (citing *Babbitt v. Farm Workers,* 442 U.S. 289, 298 (1979)).[1] The Supreme Court has recently "tightened the hatches" on the injury-in-fact showing required in this context, clarifying that allegations "of *possible* future injury" are not enough. *Vonderhaar v. Village of Evendale,* 906 F.3d 397, 401 (6th Cir. 2018) (internal citations omitted). In determining whether pre-enforcement injury exists, the Sixth Circuit considers whether there is "some combination of:" "(1) a history of past enforcement… (2) enforcement warning letters sent to the plaintiff[] regarding [its] specific conduct… and/or (3) an attribute of the challenged statute that makes enforcement easier or more likely…" *Plunderbund Media, L.L.C. v. DeWine,* 753 Fed.Appx. 362, 366-7 (6th Cir. 2018) (citing *McKay v. Federspiel,* 823 F.3d 862, 869 (6th Cir. 2016)).[2]

---

[1] In such cases, Article III standing and ripeness "boil down to the same question" and should be considered together. *MedImmune, Inc. v. Genetech, Inc.,* 549 U.S. 118, 128, n8 (2007); *see also Winter v. Wolnitzek,* 824 F.3d 681, 687 (6th Cir. 2016) ("the line between Article III standing and ripeness in pre-enforcement First Amendment challenges has evaporated.")

[2] Under *McKay,* Courts may also consider a state actor's refusal to disavow future enforcement. 823 F.3d at 869. Defendant has made no such affirmative refusal here and has in fact suggested it does not consider Lyceum to be covered by the Ordinance. Decl. ¶¶14-16.

3

Since the Supreme Court clarified constitutional pre-enforcement standing in *Driehaus,* the Sixth Circuit has never that found a plaintiff had standing to make a facial or as applied challenge to a law when, as here, the *McKay* requirements of past, present, and threatened future enforcement were *all* lacking. *See, e.g., Plunderbund,* 753 Fed.Appx. at 368-72 (denying preliminary injunction because plaintiff-political bloggers did not show credible threat of prosecution under state statute criminalizing internet conduct when there was neither prior nor threatened enforcement); *Vonderhaar,* 906 F.3d at 401-2 (denying preliminary injunction because there was no history of enforcement of property maintenance ordinance against plaintiff-property owners and future enforcement was not "certainly imminent"); *Miller v. Wickliffe, Ohio,* 852 F.3d 497, 502-3 (6th Cir. 2017) (plaintiff-nightclub owners lacked standing to challenge city permit ordinance where there was no past or threatened enforcement); *McKay,* 823 F.3d at 866 (plaintiff-resident lacked standing to challenge recording device ban in limited public forum when there was no credible threat of enforcement).

Here, as in *Plunderbund*, *Vonderharr*, *Miller,* and *McKay*, the Plaintiff has never been prosecuted under the Anti-Discrimination Ordinance or even threatened with enforcement. There has never been a complaint made against The Lyceum. *See* Cmpl. Ex. 3. And no attribute of the Ordinance makes enforcement likely—quite the opposite. By its terms, the Ordinance makes future enforcement highly unlikely. Plaintiff is not a place of public accommodation and the Ordinance expressly allows Plaintiff and similar religious employers to prefer to hire employees who ascribe to the employer's religious beliefs. Ord. 552.01(n), (f); 552.06(e). Moreover, the Ordinance's history shows the City *intends* to largely exempt Plaintiff. *See* Decl. ¶¶13-16. Meeting none of the *McKay* criteria for establishing injury-in-fact, Plaintiff's purported injury is

impermissibly "conjectural." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992); *see also Knapp v. City of Coeur d'Alene,* 172 F.Supp.3d 1118, 1135 (D. Idaho 2016).

"If advisory opinions are problematic, *orders* beyond the scope of Article III are worse. Such orders are not just 'ghosts that slay,'… they are orders that exercise power over real people and real institutions in the here and now with no basis for doing so." *Herring v. Silwowski,* 806 F.3d 864, 868 (6th Cir. 2015) (internal citation omitted) (vacating preliminary injunction where plaintiff lacked pre-enforcement standing). Because Plaintiff lacks standing and its claims are unripe for adjudication, this Court should deny its Preliminary Injunction Motion.[3]

## II. Plaintiff Is Unlikely to Prevail on Any of Its Constitutional Claims

### A. Plaintiff's Free Exercise Claim Will Fail

Plaintiff cannot prevail on its First Amendment free exercise claim because the Anti-Discrimination Ordinance is a law of general applicability not subject to strict scrutiny review. Plaintiff cannot prevail on its state free exercise claim because the City has a compelling interest in combatting discrimination and its Ordinance is narrowly tailored to further that interest.

#### 1. The Ordinance is a Neutral Law of General Applicability

The First Amendment's free exercise clause guarantees "the right to believe and profess whatever religious doctrine one desires." *Employment Division v. Smith*, 494 U.S. 872, 877 (internal quotations omitted). It does not, however, "relieve an individual of the obligation to

---

[3] To the extent this Court could discretionarily review Plaintiff's case based on equitable ripeness, Plaintiff also does not satisfy this extraordinary doctrine, which asks: (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented. *Miller v. City of Wickliffe, Ohio* 852 F.3d 497, 507 (6th Cir. 2017) (Rogers, J. concurring) (citing *Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 733 (1998)). As discussed, Plaintiff is not being enforced against and is experiencing no hardship at all. This Court cannot adjudicate the hypothetical case of what enforcement would look like —to the extent a case is imaginable—on the lack of facts before it.

comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Smith,* 494 U.S. at 879.

The Supreme Court affirmed this bedrock principle in *Masterpiece Cakeshop Ltd. v. Colo. Civil Rights Com'n,* 138 S. Ct. 1719, 1727 (2018). After acknowledging that "religious and philosophical objections are protected," the Court reiterated the "general rule that such objections do not allow business owners and other actors" to invoke religious objections as a defense to violations of neutral and generally applicable anti-discrimination laws. *Masterpiece Cakeshop,* 138 S. Ct. at 1727; *see also Fulton v. City of Philadelphia*, 922 F.3d 140, 152 (3d Cir. 2019) (rejecting religious agencies' free exercise challenge to city's anti-discrimination ordinance due to the Supreme Court's unequivocal mandate "that religious or conscientious objections do not supersede the basic obligation to comply with generally applicable civil rights laws provided those laws are applied neutrally.")

Plaintiff claims that the Ordinance here was "intended to limit the religious exercise and free speech rights of religious entities like The Lyceum." Plaintiff's Memorandum in Support of Motion for Preliminary Injunction ("Pl. Mem") at 10. But Plaintiff offers no proof for its speculation that the City's enactment of the Ordinance was actually a stealth attack targeting Plaintiff's religious beliefs. The facts support the opposite conclusion. The City publically announced its intent to enact a law aimed at reducing the discrimination commonly faced by marginalized classes of people in housing, employment, and public accommodations. *See* Decl. ¶¶ 9-11. The City conducted numerous public hearings, encouraged and carefully considered input from proponents and opponents of the Ordinance, and sought input on prohibiting discrimination and protecting religious freedom. *E.g., id.* ¶11. And after listening to Plaintiff's repeated input, the City tailored its Ordinance specifically to *avoid* potential burdens on religious freedom incident to

6

its goal of prohibiting discrimination. *Id.* ¶¶14-17.

Plaintiff further argues that the existence of "secular" exemptions in the Ordinance and an alleged lack of reciprocal "religious" exemptions prove that the law is not neutral or of general applicability. Pl. Mem. at 6. But no legal authority demands a numerical balancing of "secular" and "religious" exemptions in an anti-discrimination law, or demands strict scrutiny analysis upon an allegation of imbalance. And in any case, the Ordinance *does* contain exemptions that apply to Plaintiff and similarly situated religious entities. For example, the Ordinance's definition of public pccommodation excludes "any institution … which is by its nature distinctly private." Ord. 552.01(n). As the City acknowledges, this definition excludes Plaintiff and similar private [religious] schools. Decl. ¶15. The Ordinance also allows "a religious or denominational institution" to give preference "to employ an individual of a particular religion to perform work connected with the …religious activities of an institution." Ord. 552.06(e). This exemption allows Plaintiff and similar religious employers to exercise their preference to hire ministerial employees whose beliefs conform to theirs.

### 2. The Anti-Discrimination Ordinance Survives Strict Scrutiny Analysis

Regardless of the level of scrutiny applied under federal or Ohio constitutional law, the Anti-Discrimination Ordinance survives. A law does not violate the free exercise provisions in Article 1, Section 7 of the Ohio Constitution if it "serves a compelling state interest and is the least restrictive means of furthering that interest." *Humphrey v Lane*, 89 Ohio St. 3d 62, 66 (Ohio 2000). The Ordinance here satisfies both requirements.

First, courts "plainly" recognize remediation of discrimination as a compelling government interest. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984); *see also, e.g., Bob Jones University v. United States*, 461 U.S. 574, 604 (1983). This is because discrimination "deprives persons of their

individual dignity and denies society the benefits of wide participation in political, economic, and cultural life," *Jaycees*, 468 U.S. at 625, and causes "unique evils that the government has a compelling interest to prevent." *Id.* at 628.

Second, the Ordinance is narrowly crafted to prohibit discrimination and to avoid any unnecessary inclusion of Plaintiff or others based on religion. As previously noted, the Ordinance's public accommodation provisions are inapplicable to Plaintiff and other private entities, and its employment provisions provide a ministerial exemption. These critical features distinguish this Ordinance from those treated in the cases that Plaintiff contends are analogous.

The law successfully challenged in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) targeted *only* a certain religious group's activity, prohibiting the killing of animals only as part of a religious ritual but allowing the slaughter of animals for any other reason. Likewise, the policy prohibiting police officers from having facial hair, which was struck down in *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d Cir. 1999), allowed medical exceptions but denied an exception for Sunni Muslims based on their religious beliefs. As the Third Circuit recently observed, what "[t]hese cases have in common [is] that religiously motivated conduct was treated worse than otherwise similar conduct with secular motives." *Fulton,* 922 F.3d at 156 (3d Cir. 2019). But not so here. Unlike the laws struck down in *Lukumi* and *Fraternal Order of Police*, the Ordinance here was never intended to, and was narrowly crafted in order *not* to, target Plaintiff or others based on religion. Decl. ¶¶11-17.

### B. Plaintiff's Free Speech Claims Will Fail

The Lyceum's speech claims fail for similar reasons as their religion claims: the City's Anti-Discrimination Ordinance permissibly regulates discriminatory conduct without burdening other rights.

8

Like any law prohibiting invidious discrimination against designated classes, the Ordinance regulates injurious conduct to which speech is incidental. *E.g., Jaycees*, 468 U.S. at 623. Such laws are not reviewed as content-based speech limitations, let alone considered viewpoint discrimination, and are not subject to heightened scrutiny. For example, in upholding a Michigan anti-discrimination law requiring private clubs to admit women, *Jaycees* held that the law did "not aim at the suppression of speech" and was not viewpoint-based, but rather "reflect[ed] the State's strong historical commitment to eliminating discrimination." *Id.* at 624. The Supreme Court has repeatedly recognized that anti-discrimination laws forbidding discriminatory postings are permissible regulations of conduct, rather than limitations on expression. "[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech. That is why a ban on race-based hiring may require employers to remove 'White Applicants Only' signs." *Sorrell v. IMS Health Inc.,* 564 U.S. 552, 567 (2011) (citing *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U. S. 47, 62 (2006)).

To the extent the Anti-Discrimination Ordinance touches Plaintiff's speech at all, "that is because virtually all government regulation affects speech. Human relations take place through speech. And human relations include community activities of all kinds—commercial and otherwise." *Expressions Hair Design v. Schneiderman,* 137 S.Ct. 1144, 1152 (2017) (Breyer, J. concurring). By prohibiting employers and places open to the public from posting "need-not-apply" type language, *see* Ord. 552.02(f); 552.04(b), the City outlaws invidious discrimination in the only way it can—since the act of discrimination occurs through communicating that someone is unwelcome. "Need not apply" is not at all the type of expression that the First Amendment protects.

9

Regardless of the analysis this Court uses, anti-discrimination legislation such as the Ordinance is a compelling government interest surviving any level of scrutiny against a First Amendment challenge. This has been well settled since courts upheld the 1964 Civil Rights Act by rejecting theories like the one The Lyceum advances here. *E.g. Newman v. Piggie Park,* 390 U.S. 400 at FN 5 (1968); *Bob Jones Univ.,* 461 U.S. at 604. The federal courts have steadfastly maintained their refusal to consider discrimination a First Amendment right in more recent cases involving gender identity and sexual orientation discrimination. *E.g., Masterpiece Cakeshop,* 138 S. Ct. at 1727*; Fulton,* 922 F.3d at 158-9. Because government prohibition against discrimination in employment and public accommodations "is unrelated to the suppression of expression," it "plainly serves compelling state interests of the highest order." *Jaycees,* 468 U.S. at 624. The City's Anti-Discrimination Ordinance is no different: its goal is the protection of vulnerable people against discrimination, and it achieves this crucial goal through a neutral regulation, carefully crafted to burden other rights no more than absolutely necessary.

**C. Plaintiff's Vagueness Claims Will Fail**

**1. The Lyceum is Not Subject to the Ordinance Section That It Claims is Vague**

The Lyceum is not a public accommodation and therefore not covered by the provision of the Anti-Discrimination Ordinance that it alleges are vague. The Ordinance, at 552.01, defines "Place of public accommodation" as follows:

> (n) Place of public accommodation means inns, taverns, hotels, motels, restaurants, wholesale outlets, retail outlets, banks, savings and loan associations, other financial institutions, credit information bureaus, insurance companies, dispensaries, clinics, hospitals, theaters, recreational parks and facilities, trailer camps, garages, public halls, and all other establishments which offers goods, services, accommodations and entertainment to the public within the City***. A place of public accommodation does not include any institution, club or other place of accommodation, which by its nature is distinctly private.***

(Emphasis supplied.) The Lyceum is a private religious school. Cmpl. at 1. But the long and specific list of establishments covered by the definition does not include any type of educational institution. Moreover, the definition specifically excludes "any institution… which by its nature is distinctly private." Ord. 552.01(n). Since it does not cover *schools*, and it does not cover *private* entities, the Ordinance clearly does not cover *private schools* like The Lyceum. The construction of the Ordinance is further evidence that schools are not public accommodations: While the Ordinance specifically defines the term "Educational Institution," Ord. 552.01(f), in its Definitions section, it does not include the term in its list of examples of public accommodations. Manifestly, the Ordinance writers were aware of this category and thus could and would have listed it as a type of public accommodation had they so intended. *See also* Decl. ¶15.

Were the Ordinance not already crystal clear that private schools are not public accommodations, we would find the same answer in case law. Courts considering whether a particular enterprise is public or private consider several factors. One is whether the entity operates for profit (a profit motive tends to mark a place as a public accommodation). *E.g., Daniel v. Paul*, 395 U.S. 298, 301–02 (1969) (recreation "club" was not private because it was a business operated for a profit); *Daniel v. Am. Bd. of Emergency Med.,* 802 F. Supp. 912, 928 (1992) (noting distinction between for-profit versus non-profit, operated solely for benefit and pleasure of members). A second factor is whether the entity is selective about its membership. *Nesmith v. Young Men's Christian Ass'n of Raleigh*, 397 F.2d 96, 101–02 (4th Cir. 1968) (noting the Civil Rights Act's "clear purpose of protecting only 'the genuine privacy of private clubs . . . whose membership is genuinely selective'"). The size of an organization is a factor in determining whether it is selective, "[w]here there is a large membership or a policy of admission without any kind of investigation of the applicant, the logical conclusion is that membership is not selective."

*Id.* Third, a private entity is exclusive and oriented toward its members. A private entity has procedures to screen applicants; limits the use of its facilities to members and bona fide guests; is controlled by the membership through meetings and elections; and is operated for the benefit of its members. *Wright v. Cork Club*, 315 F. Supp.1143, 1153 (S.D. Tex. 1970). All of these factors converge to validate the words of the Ordinance and its legislative history, *see* Decl. ¶15. The Lyceum is a private entity, not a public accommodation.

### 2. The Ordinance is Not Vague

The Lyceum's vagueness claim is directed at the section of the Ordinance that forbids a public accommodation from publishing statements that "indicate[]" it will refuse services to people, or "that an individual's patronage or presence is objectionable, unwelcome, unacceptable, or undesirable." Ord. 552.04(b). The Lyceum contends that these words fail to "provide people of ordinary intelligence adequate notice of what statements are prohibited because the terms 'objectionable, unwelcome, unacceptable, or undesirable' are undefined, broad and subjective." Pl. Mem. at 14. The Lyceum adds that use of the word "indicates" compounds the vagueness.

As a threshold matter, statutes must be construed to avoid constitutional problems. *Staley v. Jones*, 239 F.3d 769, 773 (6th Cir. 2001). So, although it "will always be true that the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of (disputed) terms will be in nice question,'" *American Communications Assn. v. Douds*, 339 U.S. 382, 412 (1950), exercising the imagination is not the appropriate task to undertake here. Instead, the Court must give the Ordinance's words the constitutional benefit of the doubt. The Anti-Discrimination Ordinance uses common words; reference to a dictionary yields no surprises: "Unwelcome" means "not wanted or welcome." "Objectionable means "undesirable" or "offensive." "Unacceptable"

12

means "not acceptable," "not pleasing," or "unwelcome." "Undesirable" means "not desirable" or "unwanted." https://www.merriam-webster.com/dictionary.

A non-discrimination law employing language nearly identical to South Euclid's was recently upheld against a vagueness challenge in *Fort Des Moines Church of Christ v. Jackson*, 215 F.Supp.3d 776 (S.D. Iowa 2016). The law at issue there provided that a public accommodation may not "directly or indirectly advertise or in any other manner **indicate or publicize** that the patronage of persons of any particular race, creed, color, sex, sexual orientation, gender identity, national origin, religion, or disability is **unwelcome, objectionable, not acceptable, or not solicited.**" (Emphases supplied). The court looked up the "string of qualifiers—'unwelcome, objectionable, not acceptable, or not solicited'" in the dictionary. *Id.* "[C]onsidering [these words] together within the context of the laws in question —laws aimed at preventing discrimination," the court upheld the provisions, determining that, "[t]hough not perfect, the terms sufficiently describe messages of limited access to a public accommodation's goods or services based on membership in a protected class." *Jackson,* 215 F.Supp.3d at 776.

### III. Plaintiff Has Failed to Demonstrate Irreparable Harm, Absence of Substantial Harm to Others, or that an Injunction Would Serve the Public Interest

Plaintiff argues that the Anti-Discrimination Ordinance's purported "repress[ion]" of its First Amendment rights constitutes irreparable harm. *See* Pl. Mem. at 15 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). But while *Elrod* establishes that a constitutional injury would suffice for irreparable harm, it is not enough to show that a hypothetical violation *might* be suffered at some *unknown* future time by *some* person or entity. To obtain preliminary relief, Plaintiff must adduce evidence that it will actually suffer the alleged repression. *E.g. Ctr. for Biological Diversity v. Lueckel*, 417 F.3d 532, 536 (6th Cir. 2005) (plaintiff who showed only "theoretical" harm had failed to show either standing or a basis for injunctive relief). Plaintiff has not done so, *see supra*

Section I. Succinctly stated, Plaintiff's failure to demonstrate any injury sufficient to support standing is also fatal to its claim of irreparable harm. *Id.* at 417 F.3d at 536.

Plaintiff next asserts that an injunction would not substantially harm others or contravene the public interest because Plaintiff believes itself likely to prevail. *See* Pl. Mem. at 15. Yet enjoining enforcement of the Anti-Discrimination Ordinance, even temporarily, denies the law's antidiscrimination protection to those who live or work in the City, or patronize any place of public accommodation within the City's borders. Such action contravenes the strong public interest in preventing discrimination against vulnerable or protected classes of persons. *E.g.*, *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 222 (6th Cir. 2016) (public interest weighed "strongly" against staying an injunction allowing continued discrimination against a student based on gender identity); *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 878 (S.D. Ohio 2016) (same).

## **CONCLUSION**

For the reasons set forth in this brief, Plaintiff's Motion for Preliminary Injunction should be denied.

May 21, 2019

<div style="display: flex;">
<div>

/s/ *Elizabeth Bonham*
Elizabeth Bonham, Trial Counsel (0093733)
Freda J. Levenson (0045916)
Susan J. Becker (0010205)
American Civil Liberties Union of Ohio Fdtn.
4506 Chester Avenue
Cleveland, OH 44103
Tel.: (216) 472-2220
Fax: (216) 472-2210
flevenson@acluohio.org
sbecker@acluohio.org
ebonham@acluohio.org

</div>
<div>

David Carey (0088787)
American Civil Liberties Union of Ohio Fdtn.
1108 City Park Avenue
Columbus, OH 43206
Tel.: (614) 586-1972
Fax: (216) 472-2210
dcarey@acluohio.org

Michael E. Cicero (0058610)
Assistant Law Director
City of South Euclid
1349 S. Green Road
S. Euclid, Ohio 44121
Tel.: (216) 381-0400
Fax: (216) 381-0467
cicero@nicola.com

</div>
</div>

## CERTIFICATE OF SERVICE

I certify that on this 21st Day of May, 2019, I filed a copy of the foregoing using the Court's ECF System, and it was served on counsel for all parties through that system.

/s/ *Elizabeth Bonham*
Elizabeth Bonham, Trial Counsel (0093733)
Attorney for the Defendant